IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA <u>ex</u> <u>rel.</u> | * | |
| | | |
| MICHAEL I. LEVINE, M.D., | * | |
| 150 Broadway, Ste. 1601 | | |
| New York, New York, 10038 | * | |
| | | |
| Plaintiff-Relator, | * | |
| | | **CIVIL FALSE CLAIMS ACT** |
| v. | * | **COMPLAINT FILED UNDER** |
| | | **SEAL PURSUANT TO 31 U.S.C.** |
| VASCULAR ACCESS CENTERS, L.P. | * | **§ 3729, <u>et</u> <u>seq</u>** |
| and each of its subsidiary and/or related | | |
| corporations | * | |
| 2929 Arch Street, Suite 620 | | |
| Philadelphia, PA 19104 | * | |
| | | **DO NOT PLACE IN PRESS BOX** |
| | * | **DO NOT ENTER IN PACER.** |
| JAMES MCGUCKIN, M.D., | * | |
| (and any and all clinics owned, run, | | |
| managed or operated by him) | * | |
| 2929 Arch Street | | |
| Suite 620 | * | |
| Philadelphia, PA 19104 | * | |
| | | |
| PHILADELPHIA VASCULAR | * | |
| INSTITUTE, LLC | | |
| 585 County Line Road | * | |
| Radnor PA 19085 | | |
| | * | |
| ROBERT MATALON, M.D. | | |
| (and any and all clinics owned, run, | * | |
| managed or operated by him) | | |
| c/o Lower Manhattan Dialysis Center, Inc. | * | |
| 187 Third Avenue | | |
| New York, New York 10003 | * | |
| | | |
| JOSEPH SHAMS, M.D. | * | |
| c/o Beth Israel Medical Center | | |
| First Avenue at 16th Street | * | |
| New York, New York 10003 | | |

NEW YORK DOWNTOWN HOSPITAL    *
170 William Street
New York, New York 20038    *

BETH ISRAEL MEDICAL CENTER    *
First Avenue at 16th Street
New York, New York 10003    *
     Serve On:
     Continuum Health Partners, Inc.    *
     Attn: General Counsel
     555 W. 57th Street, 18th fl    *
     New York, New York 10019
   *

AMERICAN ACCESS CARE, LLC    *
457 Franklin D. Roosevelt Dr.
New York, New York 10003    *
     Serve On:
     American Access Care, LLC    *
     182 Industrial Road
     Glen Rock, Pennsylvania 17327    *
   *

DAVITA, INC.    *
601 Hawaii Street
El Segundo, California 90245    *
     Serve On:
     Corporation Service Co.    *
     1560 Broadway, Ste. 2090
     Denver, Colorado 80202    *
   *

FRESENIUS MEDICAL CARE
HOLDINGS, INC.    *
920 Winter Street
Waltham, Massachusetts 02451-1457    *
     Serve On:
     CT Corporation Services    *
     111 Eighth Avenue
     New York, New York 10111    *

MICHAEL M. ABIRI, M.D.    *
c/o Beth Israel Medical Center
First Avenue at 16th Street    *
New York, New York 10003

TODD MARKOWITZ, M.D.                        *
c/o Beth Israel Medical Center
First Avenue at 16th Street                 *
New York, New York 10003
                                            *

DANIEL MATALON, M.D.
530 First Street, Ste 4A                    *
New York, New York 10016
                                            *

ALBERT MATALON, M.D.
530 First Street, Ste 4A                    *
New York, New York 10016
                                            *

GREGG A. MILLER, M.D.
c/o American Access Care                    *
     Physicians, PLLC
577 Prospect Avenue                         *
Brooklyn, New York 11215
                                            *

ALLEN WIESENFELD, M.D.
1200 Waters Place, #M112                    *
Bronx, New York 10461
                                            *

NEW YORK UNIVERSITY
SCHOOL of MEDICINE and                      *
LANGONE MEDICAL CENTER
550 First Avenue                            *
New York, New York 10016
                                            *

EDWARD Y. SKOLNIK, M.D.
530 First Avenue                            *
New York, New York 10016
                                            *

ARTURO CONSTANTINER, M.D.
19 Beekman St., 6th floor                   *
New York, New York 10038
                                            *

WARREN B. LICHT, M.D.
c/o New York Downtown Hospital              *
170 William Street
New York, New York 20038                    *

ANTHONY SMITH, M.D.                         *
c/o New York Downtown Hospital
170 William Street                          *
New York, New York 20038

ALICE WEI, M.D.                          *
2615 Frederick Douglass Blvd
New York, New York 10030                 *

GARY A. GELBFISH, M.D.                   *
2502 Avenue I
Brooklyn, New York 11210                 *

ALAN J. BOYKIN, M.D.                     *
2502 Avenue I
Brooklyn, New York 11210                 *

AXCESS GREAT NECK, LLC                   *
600 Northern Blvd, #115
Great Neck, New York 11021               *

    *     *     *     *     *     *     *     *     *     *     *     *

## COMPLAINT AND JURY DEMAND

Plaintiff-Relator, by and through his undersigned counsel, brings this *qui tam*

action in the name of the United States of America and the States of New York and New

Jersey against the above named Defendants (hereinafter collectively referred to as

"Defendants").

1.      This is an action to recover damages and civil penalties arising from false

claims and services provided to patients requiring renal replacement therapies,

specifically hemodialysis, that are reimbursed by Medicare, Medicaid, and other federal

programs including the federally-funded End Stage Renal Disease ("ESRD") program.

2.      As outlined in more detail below, Defendants' illegal activities center on

the unnecessary provision of "vascular access services" and percutaneous interventions

upon ESRD patients and their arteriovenous vascular accesses, draining veins, and

feeding arteries including but not limited to duplex ultrasound, percutaneous balloon

angioplasty ("angioplasty"), stent deployment, angiography, and percutaneous thrombectomy in patients requiring hemodialysis.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 because this action arises under the laws of the United States.  This Court has pendent jurisdiction over the State False Claims Act claims pursuant to 28 U.S.C. § 3732(a).

4.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a).

5.      Venue is proper in this District because Defendants resided, transacted business, and can be found in this judicial district.

## PARTIES

6.      Plaintiff-Relator is a physician who is board certified in internal medicine and nephrology.   He is trained in the diagnosis and management of kidney disease and/or kidney disorders.  He also has extensive training and experience in managing ESRD patients, supervising hemodialysis and associated therapies, and the surveillance, assessment, and percutaneous treatment of arteriovenous hemodialysis vascular access.

7.      The Plaintiff-Relator is a respected member of the medical community, particularly in the area of hemodialysis vascular access, which can be verified by testimony of his professional peers and patients.

8.      Plaintiff-Relator is or was associated with various hospitals, hemodialysis treatment facilities, and vascular access centers in the New York and New Jersey regions owned, operated and/or managed by Defendants.   From the end of March 2009 through

July 2009 Plaintiff-Relator was employed by Vascular Access Centers and Philadelphia

Access Centers ("VAC") owned by Defendant James McGuckin, although he actively

worked there from the end of March 2009 through April 2009.

      9.     He was terminated by Defendant McGuckin because he failed to provide

services the "Vascular Access way", and would not agree to alter a previously mutually

agreed upon and signed contract which, had the contract been altered,  would have

required up to a six month "re-training and indoctrination" by Dr. McGuckin.

      10.    After being fired from VAC/PAC, Plaintiff-Relator worked with

Defendant Robert Matalon, M.D.  In addition, Plaintiff-Relator is familiar with the

medical practices of the other named defendants as it relates to the current complaint.

      11.    Vascular Access Centers, L.P. is a Pennsylvania limited liability

partnership maintaining its principle place of business at Cira Centre, 2929 Arch Street,

Suite 620, Philadelphia, Pennsylvania 19104.  VAC provides comprehensive dialysis

access maintenance by and through various vascular access centers located throughout

the United States.

      12.    James F. McGuckin, Jr., M.D. is the owner, founder, and principal of

VAC.

      13.    McGuckin, through VAC and other corporations has established a web of

at least twenty-three subsidiary corporations that provide vascular access services

throughout the United States.

      14.    McGuckin, through VAC, creates these corporations by entering into

partnerships with doctors in various locations in the United States to develop and manage

medical practices specializing in vascular care.  Under the terms of the partnerships,

which are usually formalized through an operating agreement, McGuckin or VAC is the manager and majority member of the partnership.

15.     The corporations created by McGuckin and/or VAC include:  American Access Care of PA, LLC, American Access Care of South Philadelphia, PA, LLC, Philadelphia Access Institute Centers, Peripheral Vascular Institute of Philadelphia, Vascular Access Center of Pittsburgh, Vascular Access Center of Atlantic County, Texas, Vascular Access Center of West Orange (New Jersey), Vascular Access Center of Trenton (New Jersey). Vascular Access Center of Prince Georges County & Washington, D.C.,  Vascular Access Center of Durham, N.C.,  Vascular Access Center of Georgia, Vascular Access Center of Atlanta, Vascular Access Center of South Atlanta, Vascular Access Center of Jacksonville, Florida, Vascular Access Center of Memphis, TN, Vascular Access Center of Mississippi, Vascular Access Center of New Orleans, Vascular Access Center of Southwest, Louisiana,  Vascular Access Centers of North Shore (Louisiana), Vascular Access Center of Houston, Vascular Access Center of South Los Angeles, and the Vascular Access Centers of Seattle, Washington.

16.     Robert Matalon, M.D. is nephrologist and an Associate Professor of Clinical Medicine at New York University Langone Medical Center specializing in internal medicine and nephrology in the New York metropolitan area.  Dr. Matalon is also affiliated with a number of hospitals including the NYU Hospital for Joint Diseases, NYU Hospital's Center, Bellevue Hospital Center, Beth Israel Medical Center, Petrie Division, New York Downtown Hospital, Rusk Institute of Rehabilitational Medicine, Tisch Hospital, Beth Israel Medical Center, Herbert & Neil Singer Division, and IMC St. Johns, Episcopal Hospital in Brooklyn, NY.  He is a member of Nephrology Associates

of Manhattan, and also owns and operates Lower Manhattan Dialysis Centers at 17th and 34th streets, Chinatown Dialysis Center, and River Renal Dialysis Center located at Bellevue Hospital which is part of the New York City Health and Hospitals Corporation. All of these facilities are located in Manhattan, New York City, N.Y.

17.     Joseph Shams, M.D. is board certified in interventional radiology with privileges at Beth Israel Medical Center in New York, NY and Beth Israel Medical Center, Kings Highway Division in Brooklyn, NY.  He also performs vascular and diagnostic radiology with practices in Jersey City, New Jersey, Brooklyn, New York, and New York, New York.  Dr. Shams also actively works at Union Square Interventional Radiology Center.

18.     New York Downtown Hospital is located in lower Manhattan, New York and has an on-site chronic and acute hemodialysis center.  It is a member of the New York-Presbyterian Health Care System.  Its outpatient hemodialysis center was recently closed and the majority of patients transferred to units owned by Dr. Robert Matalon.

19.     Beth Israel is an acute care hospital in New York and is a member of Continuum Health Partners.

20.     American Access Care ("AAC") is a for-profit corporation with headquarters in Glen Rock, Pennsylvania.   It has 29 locations in twelve states including New York, New Jersey, and Pennsylvania.  AAC specializes in the management and provision of dialysis access for patients.  It has recently been reported American Access Care is to be purchased by Fresenius Medical Care for approximately $385 million dollars.

21.     DaVita, Inc. is Fortune 500 company with over 1,642 kidney dialysis facilities throughout the United States including New York, New Jersey, and other locations on the east coast of the United States.  RMS Lifeline, also known as Lifeline Vascular Access, is an operator of numerous out-patient for-profit vascular access centers and is a subsidiary of DaVita, Inc.

22.     Fresenius Medical Care Holdings, Inc., North America is a provider of dialysis services with its headquarters in Waltham, MA.  It provides dialysis services throughout the world, including over 2,700 dialysis clinics in North America.

23.     Michael M. Abiri, M.D. is Chairman of Radiology at St. Luke's-Roosevelt Hospital Center and Beth Israel Medical Center in New York City.

24.     Todd E. Markowitz, M.D. is an interventional radiologist who helps to staff the Union Square location of Beth Israel Medical Center's vascular access center.

25.     Daniel Matalon, M.D. is the son of Robert Matalon, M.D. and is a member of Nephrology Associates of Manhattan and helps to staff his father's dialysis units.  He is an internist and nephrologist.

26.     Albert Matalon, M.D. is the son of Robert Matalon, M.D. and is a member of Nephrology Associates of Manhattan and helps to staff his father's dialysis units.  He is an internist and nephrologist.

27.     Gregg A. Miller, M.D. is an internist, nephrologist, and vascular access interventionalist and is the medical director of American Access Care.

28.     Allen Weisenfeld. M.D. is an interventional radiologist with an active hemodialysis vascular access practice in the New York City area.

29.     Edward Y. Skolnick, M.D. is the Chief of the Division of Nephrology at New York University School of Medicine.

30.     New York University School of Medicine is a major medical school in New York and the United States and has multiple hospital affiliations including with Bellevue Hospital of the New York City Health and Hospitals Corporation and Tisch Hospital/NYU Langone Medical Center. Despite opportunities to contract with other dialysis providers, after a number of years of delay on the part of Dr. Matalon the hemodialysis unit at Bellevue Hospital has recently been opened by him.

31.     Arturo Constantiner, M.D. is an internist and nephrologist, the former medical director of the New York Downtown Hospital out-patient hemodialysis unit, and the current Chief of Nephrology at New York Downtown Hospital.

32.     Warren B. Licht, M.D. is the Chief Medical Officer at New York Downtown Hospital.

33.     Anthony Smith, M.D. is the Chairman of Medicine at New York Downtown Hospital.

34.     Alice Wei, M.D. is an internist and nephrologist who was hired as a consultant by New York Downtown Hospital to assist with running the hospital's out-patient dialysis unit, and subsequently helped to oversee the closing of the dialysis unit.

35.     Gary A. Gelbfish, M.D. is a vascular surgeon and vascular interventionalist who owns for-profit vascular access centers in Brooklyn and in Manhattan.

36.     Alan J. Boykin, M.D. is an interventional radiologist employed by Dr. Gelbfish.

37.     Axcess Great Neck LLC is a for profit outpatient vascular access company in the New York area that reportedly bases itself on American Access Care.

38.     Plaintiff-Relator is the "original source" of the information contained in the complaint within the meaning of 31 U.S.C. § 3730(e) (4) and has personal knowledge of the false records and statements presented to the United States by, or on behalf of, Defendants.

39.     The violations of the False Claims Act arise because Defendants have submitted claims to, and received funds from, the federal and state funded health care programs based on claims, which the Defendants knew, or reasonably could have been expected to have known, were false claims.

## BACKGROUND

## GOVERNMENT REIMBURSEMENT FOR ESRD SERVICES

40.     Defendants filed claims with, and received monies from, the Medicaid program.  Medicaid is a health insurance program established for the poor by Title XIX of the Social Security Act and is administered by the states, 42 U.S.C. § 1396 et seq.

41.     The United States Government provides reimbursement to the states for a percentage of the health care expenses paid under the Medicaid program.

42.     Defendants also filed claims with, and received payment from, the Medicare program.  Medicare was established by Title 18 of the Social Security Act, 42 U.S.C. § 1395 et seq. and covers medical expenses for elderly and disabled individuals. A component of the Medicare program is the Medicare End Stage Renal Disease Program (hereinafter "Medicare ESRD"), which provides federal reimbursement for patients with end stage renal disease.

43.     Many of Defendants' patients are elderly, disabled, and/or financially challenged individuals with end stage renal disease.  The cost of their medical care was, and is, reimbursed by the Medicare and Medicaid programs.

### End Stage Renal Disease

44.     Chronic kidney disease which has progressed to "end stage" manifests as the complete or almost complete failure of the kidneys.  The kidneys can no longer remove waste and other excess by-products of metabolism from the body, and they lose their ability to regulate the body's electrolyte composition and extra-cellular fluid volume in the setting of obligatory on-going food and fluid intake. At end stage, the kidneys also cannot produce the hormones erythropoetin and 1,25 dihydroxy vitamin D, which are critical for maintaining adequate red blood cell mass, and bone and calcium metabolism, respectively.

45.     End Stage Renal Disease ("ESRD") occurs when the kidneys can no longer function at a level necessary for daily life and usually results when chronic kidney disease has progressed to a point where a patient's kidney function is less than ten percent of normal kidney function.

46.     Failure of a patient with ESRD to receive renal replacement therapy ultimately results in death.

47.     Recognizing the efficacy of renal replacement therapy, in 1972 Congress enacted the Medicare ESRD program to provide federal reimbursement for ESRD treatments.

48.     Most ESRD patients cannot immediately receive a kidney transplant.  As a result, kidney dialysis, also known as hemodialysis, is a mandatory treatment protocol in

order for ESRD patients to remain alive, in addition to the much less frequently utilized

alternative known as chronic ambulatory peritoneal dialysis (CAPD).

49.     During hemodialysis, a medical technician "accesses" a patient's

circulation, usually through the arm and sometimes the leg so that the blood can be

pumped through a hemodialysis machine.  In the machine, the blood passes via tubing

through a dialysis membrane that removes toxins generated by protein metabolism,

potassium, excess sodium chloride and water from the patient's blood.  In addition, the

machine infuses bicarbonate and calcium into the patient's bloodstream.  Via the dialysis

tubing circuit vital intravenous medications such as erythropoietin and 1,25 dihydroxy

vitamin D analogs can easily be administered to the patient during the dialysis treatment.

50.     Most patients undergo hemodialysis treatments three times per week in a

medical facility commonly referred to as a "dialysis facility."

51.     It is understood and expected by Medicare and Medicaid that dialysis

facility staff and the patients' primary nephrologists are responsible for providing safe

dialysis treatments and for the monthly assessment and management of a number of key

areas vital and unique to the ESRD patient.  These areas include: adequacy of dialysis,

anemia management, nutrition, bone metabolism, potassium homeostasis, iron levels,

blood pressure control, extracellular volume status, and vascular access surveillance.

52.     In return, the nephrologist is reimbursed, by the federal government, a

monthly capitated fee which is proportional to the number of patient visits, up to a total

of four per month, defined as direct patient-doctor contact.

53.     Patient-doctor interactions and assessments are to be documented in the

patient's chart, and each month, at a minimum there must be a comprehensive note

written by the nephrologist or their representative indicating that the key areas of

hemodialysis patient management have been reviewed and abnormalities addressed.

54.     In addition, the Government's ESRD reimbursement rules require that the

nephrologist and the dialysis facility coordinate an interdisciplinary care plan that

reviews the key areas of patient management along with psycho-social parameters and

plans to address those areas that are out of compliance with expected clinical outcomes

documented.  Dieticians, social workers, nurses, and nephrologists all contribute to and

sign off on the care plan based on the areas of patient care that fall within their

jurisdiction.

### The Importance of "Access" to
### an ESRD Patient's Circulatory System

55.     In order to perform chronic outpatient hemodialysis there must be the

ability to safely and repeatedly obtain access to patients' circulation.  Accordingly,

patients with ESRD require what is known as "long term" or "permanent" vascular

access.

56.     There are currently four primary methods of gaining vascular access for

hemodialysis: arteriovenous fistulas and grafts, and tunneled and non-tunneled catheters

("catheters").

57.     The two preferred methods of gaining access are through either grafts or

fistulas, with fistulas considered the "state of the art" treatment by most practitioners.

58.     Regardless of the method used, ESRD patients can, and do, suffer from

complications to their access sites.  These include infections and, in the case of fistulas

and grafts, the formation of narrowings or stenoses.

59.     If left untreated, narrowings within the vascular access site will ultimately

cause the access to fail and require additional procedures to create a new access site.

60.     The Government's reimbursement rules incorporate the national standard of care principles first promulgated in 1997 by the National Kidney Foundation.  These principals are outlined in a series of publications that are known as the "Dialysis Outcomes Quality Initiative in the United States" and are commonly referred to as the "K-DOQI Guidelines."

61.     Under the K-DOQI guidelines, treatment of a patient's access is expected to be "proactive" rather than "reactive."  Thus, rather than waiting until a patient shows overt signs of access failure or dysfunction, the Government reimburses the patient's dialysis facility, as well as the patient's treating nephrologist, to monitor a patient's access site for signs of dysfunction.  In addition, the "care plan" created for each patient requires analysis and recommendations for maintaining vascular access.

62.     The duty (and payment) for access surveillance and monitoring are made in a monthly capitated rate paid by the Government to the dialysis facility and the treating nephrologist.

63.     Because a patient's dialysis facility and treating nephrologist are paid by Medicare to monitor access, other medical professionals should not take that responsibility upon themselves.  Doing so would not only be duplicative, it would encourage nephrologists and dialysis facilities to reduce the treatment they provide to patients even though they are expected to perform the service.

64.     Furthermore, because the nephrologist and the dialysis facility are in the best position to determine if additional interventions to the patient's access are medically reasonable and necessary, the dialysis facility and the nephrologist, not third-party

treating physicians or access centers, are the individuals whom Medicare and Medicaid expect to make the decision to refer patients to specialists for additional interventions such as diagnostic angiograms, angioplasty, and, when necessary, surgical revision, prior to the onset of critical access dysfunction or thrombosis.

65.     Referrals for interventions, moreover, should be based on well defined and established clinical indicators of access malfunction.  These include such things as excessive bleeding from an access because a stenosis is causing intra-access hypertension or suboptimal dialysis performance.

## I.     ACCESS CENTER FRAUD

**(Defendants:  James McGuckin M.D. and all centers owned and/or managed by him in including Philadelphia Access Centers and Vascular Access Centers, Joseph Shams, M.D., Beth Israel Medical Center, American Access Care, New York University School of Medicine and Medical Center, Axcess Great Neck LLC, and American Access Care)**

### (A)     <u>Medically Unnecessary "Follow Up" Procedures</u>

66.     Each Defendant named in this Section I owns and/or is employed by "access centers" that provide services to ESRD beneficiaries.  Access centers are usually staffed by vascular surgeons or interventional radiologists.

67.     Under the Government's reimbursement rules, the role of an access center should be limited to two areas.  First, after referral by the patient's treating nephrologist, access centers create the long-term access necessary to perform hemodialysis by either inserting a catheter, surgically inserting an arteriovenous graft, or surgically creating an arteriovenous fistula.  Second, after referral by a patient's nephrologist or dialysis facility, access centers perform subsequent corrective procedures in order to maintain access and prevent critical access dysfunction or thrombosis.

68.     Because the government already pays for access monitoring by both the nephrologist and the dialysis facility, access centers (and the physicians employed by an access center) have no role in monitoring accesses or deciding when, or if, additional interventions are necessary.  Thus, upon receiving a referral by the dialysis facility or the treating nephrologist, access centers should perform the corrective procedures requested by the nephrologist or dialysis facility and then refer the patient back to the dialysis facility for dialysis and for further ongoing monitoring of the access site

69.     Moreover, because the ESRD beneficiary undergoes dialysis at least three times a week, there is an objective evaluation of the access centers' treatment that is usually performed within days after the access center has rendered the service.  As such, access centers have no role in determining if the corrective procedure was successful, nor do they have the right to determine whether follow-up diagnostic angiography or other corrective interventions should be performed.

70.     Access centers also have no need to monitor patients after completing the procedure requested by the dialysis facility or nephrologist.  Indeed, because access centers stand to gain additional compensation by keeping patients under their care, there is a clear over-utilization risk associated with access centers directing patient treatment.

71.     Rather than providing services in the most efficient method possible, Defendants maintained a corporate-wide practice of "holding on" to patients for ongoing monitoring and treatment.

72.     The patients, however, did not uniformly have defined needs for additional treatment or evaluation, and Defendants' monitoring was duplicative and medically unnecessary.

73.     Specifically, Defendants engaged in this practice by creating corporate-wide policies of instructing ESRD patients to return for "follow-up" visits.

74.     During these follow-up visits Defendants provided a number of medically unnecessary services such as evaluation of an ESRD patient's access site with ultrasound and/or angiography.  Defendants performed these procedures without the routine input or recommendation of the patient's dialysis center or treating nephrologist, and the sole purpose for performing these procedures was to maximize profit.

75.     The conduct of defendant James McGuckin, M.D. and the clinics owned and/or operated by Dr. McGuckin, including Vascular Access Clinics and Philadelphia Access Centers are indicative of the practices of each of the Defendants named herein.

76.     Like Dr. McGuckin's centers, the Defendants named herein had an unspoken, but fully understood, policy requiring that all patients receive "routine" follow-up surveillance angiograms, a procedure in which dye is injected into a patient's blood stream in order to detect narrowing within the graft or fistula, their draining veins, and feeding artery.

77.     In fact, Defendants VAC's practice was so blatant that Dr. McGuckin informed Plaintiff-Relator that each time a vascular access patient visited a VAC center, they should be "squirted with dye," a phrase which meant that every patient should receive an angiogram regardless of whether or not the Plaintiff-Relator believed it  was clinically necessary.

78.     Additionally, Defendants, similar to the conduct of Dr. McGuckin's centers, had what amounted to implicit standing orders requiring that all patients who had

received a successful percutaneous thrombectomies return two weeks after the surgery for a surveillance angiogram.

79.     These angiograms were entirely unnecessary, particularly since the dialysis facilities would be in a position to monitor the success of the procedure during the subsequent dialysis sessions immediately following the thrombectomy procedure. It is Plaintiff-Relator's understanding that this activity was not limited to the access centers owned and operated by Dr. McGuckin., but was also practiced by the other access centers named in this action.

**(B)     Billing for Unnecessary Surgical Procedures**

80.     As discussed above, grafts or fistulas often experience blockage and narrowings (also known as "stenosis") that require further intervention through expansion of the narrowed area with a balloon and, on occasion, via the employment of a stent when an area failed to open or re-narrowed promptly following angioplasty.

81.     As discussed above, relying on the K-DOQI Guidelines, Medicare requires that the dialysis facility and a patient's treating nephrologist, not the surgical or access centers, make diagnosis and treatment decisions regarding if, and when, a patient needs to see a vascular access specialist for consultation.

82.     Not only did Defendants make access evaluation decisions, they also implanted unnecessary stents and performed unnecessary procedures on dialysis patients.

83.     Dr. McGuckin's instructions to Plaintiff-Relator were consistent with the practices of each Defendant named in this Section I.

84.     Dr. McGuckin instructed Plaintiff-Relator that whenever a vascular access patient was on the operating table, all of the patient's stenoses were to be dilated by

angioplasties or stents, regardless of whether or not Plaintiff-Relator believed that the angioplasty was clinically necessary or appropriate.

85.     In ordering Plaintiff-Relator to perform unnecessary angioplasty procedures, Dr. McGuckin summarized his position by informing Plaintiff-Relator to "bang 'em all", and squirt all accesses with dye because "this is New Jersey."

86.     Consistent with his "bang 'em all" instructions, Dr. McGuckin further required that, at the very least, his patients be ordered to return for a subsequent follow-up angioplasty in order to "secure" their newly placed stents.  There is no clinical indication for this practice, and it was only performed to increase reimbursement.

87.      In addition, Plaintiff-Relator observed Dr. McGuckin ordering his nursing staff to bill for multiple angioplasties within individual anatomic vessel segments in violation of Medicare and Medicaid rules and accepted standards for reasonable billing practices.

88.     Upon information and belief, Plaintiff-Relator believes that the other access centers engaged in conduct similar to what he witnessed at the clinics owned and/or operated by Dr. McGuckin.

**(C)     Use of Bare Metal Stents**

89.     In addition to billing for unnecessary stents, Dr. McGuckin and the physicians at the vascular access centers owned, managed, and/or operated by Dr. McGuckin implanted the most technologically obsolete stents in patients, bare metal stents, when the option of deploying a covered stent, or not deploying a stent and referring a patient for surgical revision was an option.

90.    Specifically, rather than using covered, drug-eluting stents (which are less likely to stimulate in-stent restenosis), Dr. McGuckin implanted bare metal stents in his patients, which have been shown to have consistently high probabilities of requiring repeated angioplasties and repeat operations.

91.    It is Plaintiff-Relator's belief that Dr. McGuckin and his companies used these stents as part of a concerted effort to increase their reimbursement by ensuring that patients would need to return for additional follow-up procedures

**(D)    Billing for Services That Were Not Provided**

92.    Defendant McGuckin further had an ongoing practice of billing for thrombectomies in the setting of central venous occlusion when, in fact, he performed no specific procedures to remove thrombotic material.

**(E)    Billing for Unnecessary Services:  "Fibrous Sheaths"**

93.    Defendant McGuckin also had a practice of billing for unnecessary angioplasties to remove or disrupt what he referred to as "fibrous sheaths" in patients' blood vessels, following the removal of a central venous catheter, even though the presence of a sheath was not documented by angiogram.

94.    This dubious diagnosis and practice of fibrin sheath removal procedure was merely a method used by Dr. McGuckin's clinics to bill the government for unnecessary stent procedures.

## II.    DIALYSIS FACILITY FRAUD

**(Defendants:  Nephrology Associates of Manhattan; Lower Manhattan Dialysis Centers at 17th and 34th Streets; Chinatown Dialysis Center; River Renal Dialysis Center at Bellevue Hospital; Robert Matalon, M.D., Daniel Matalon, M.D., Albert Matalon, M.D., and all Dialysis Facilities Owned and/or Operated by Them.)**

### (A) "Farming Out" the Costs of Vascular Access Monitoring to Vascular Access Clinics

95.     Defendants Robert Matalon, M.D. and his sons Daniel and Albert are members of Nephrology Associates of Manhattan.  In addition they own, and/or manage a series of kidney dialysis facilities throughout Manhattan.

96.     As discussed above, dialysis facilities and treating nephrologists are required by the government's reimbursement rules to provide for the assessment and management of a number of areas unique to the ESRD patient, including monitoring the efficacy of a patient's vascular access.  In return for these services, both the treating nephrologist and the dialysis facility receive up to four monthly capitated payments from the Government.

97.     Rather than monitoring of their patients' access sites, Defendants "farmed out" the management and observation of access surveillance services to a variety of favored access centers, the most prominent one being the access center run by Joseph Shams, M.D. and his partners at Beth Israel Medical Center ("Beth Israel").  Once the patients were farmed out to Beth Israel, Beth Israel engaged in the same over-utilization scams as those performed by Dr. McGuckin and discussed in detail above.

98.     By farming out these services to Beth Israel and others, the Matalons received a two-fold benefit.  First, they reduced the costs of treating ESRD patients because they were able to reduce the services they provided to patients, thereby increasing their profit and productivity.  Second, in return for sending patients to Beth Israel and other hospitals for access monitoring, Beth Israel and the other hospitals referred dialysis patients to the Matalon-run dialysis facilities.

99.     Most dialysis patients are poor and lack transportation.  If they are too ill to travel by public transportation, the Government reimburses the cost of a van to transport patients to medical providers.  In order to preserve his stream of referrals for patients to his dialysis facilities, Dr. Robert Matalon, with the full knowledge of Daniel and Albert Matalon, used the government's transportation largesse to "steer" patients from his dialysis facilities to the access centers with whom his facilities had informal referral arrangements.

100.     To "steer" their patients to the proper access center, the Matalon-associated dialysis facilities provided "free" transportation to access centers.  Dr. Matalon instructed his staff to arrange transportation for patients only to facilities and doctors whom he had pre-approved.  These facilities, of course, were those with whom the Matalon-associated facilities had informal referral relationships.

101.     Plaintiff-Relator further observed Robert Matalon boasting that all decisions for referral to vascular access centers must meet a "What's in it for me?" test.

102.     Dr. Matalon further acknowledged to Plaintiff-Relator that practice of Beth Israel in continually requiring "follow-up" visits by patients was questionable.  Nonetheless, Dr. Matalon redoubled his efforts to send as many patients as possible to Beth Israel for vascular access repair.

103.     Upon information and belief, Plaintiff-Relator further believes that Dr. Robert Matalon also actively intervened to disrupt a professional collaboration between Plaintiff-Relator and Defendant Joseph Shams, M.D. of Beth Israel.  It is Plaintiff-Relator's understanding that Dr. Matalon telephoned Dr. Shams and informed Dr. Shams

that collaborating with Plaintiff-Relator would ultimately interfere in some way with the referral arrangements that Dr. Shams and Dr. Matalon had entered into.

104.    In order to preserve his mutual referral stream with Beth Israel and other hospitals, Dr. Matalon also took affirmative steps to prevent Plaintiff-Relator from applying for vascular access interventional privileges at New York Downtown Hospital. Dr. Matalon, among other things, threatened to terminate Plaintiff-Relator's employment with his dialysis facilities if Plaintiff-Relator pursued referrals from other nephrologists' patients not directly cared for by Dr. Robert Matalon's practice.

**(B)     Kickbacks:  Matalons and New York University Medical Center**

105.    Dr. Matalon's dialysis facilities receive a substantial number of referrals from New York University Medical Center.

106.    In 2011, Dr. Matalon informed Plaintiff-Relator that his employment would be terminated because, in the past, Dr. Matalon had previously entered into an informal arrangement with New York University Hospital to provide "salary support" for physicians whose hospital billings were low for one reason or another.

107.    As a result of this arrangement, Dr. Matalon terminated Plaintiff-Relator's full-time employment so that he could provide "salary support" to a NYU physician at the request of New York University physician Edward Skolnick, M.D.

**(C)     Kickbacks:  NYU School of Medicine**

108.    Dr. Matalon recently opened a dialysis facility, River Renal, at Bellevue Hospital, a major teaching facility for NYU School of Medicine.

109.    Upon information and belief, it is Plaintiff-Relator's understanding that the contract for providing services to River Renal was provided to Dr. Matalon after he made a substantial financial donation to New York University Hospital.

**COUNT ONE**
**(All Defendants)**

**(31 U.S.C. § 3729 (a) (1) (Federal False Claims Act);**
**New York False Claims Act - State Fin. Law § 189(1)(a);**
**New Jersey False Claims Act – NJSA §2A:32C-3(a))**
**(Knowingly Presenting a False or Fraudulent Claim)**

110.    Plaintiff-Relator incorporates the foregoing paragraphs as if fully set forth herein.

111.    By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval.

112.    Defendants knew, or reasonably should have been expected to know, that these claims for payment were false, fraudulent, or fictitious, or were deliberately ignorant of the truth or falsity of said claims, or acted in reckless disregard of whether said claims were true or false.  These claims were, therefore, false or fraudulent claims submitted for payment or approval to the United States in violation of 31 U.S.C. Section 3729(a) (1) and the New York False Claims Act State Fin. Law § 189(1)(a).

113.    Plaintiff, the United States, unaware of the foregoing circumstances and conduct of Defendants, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendants, which resulted in the United States being damaged in an amount to be established at trial or upon motion.

## COUNT TWO
### (All Defendants)

**(31 U.S.C. Sec. 3729 (a) (1) (Federal False Claims Act);
New York False Claims Act - State Fin. Law § 189(1)(b);
New Jersey False Claims Act – NJSA §2A:32C-3(b))
(Knowingly Making, Using, or Causing to be Made or Used, a
False Record or Statement)**

114.    Plaintiff-Relator incorporates by reference the preceding paragraphs as if fully set forth herein.

115.    By virtue of the acts described above, Defendants made, used, or caused to be made or used, false records and statements to get the false and fraudulent claims allowed and paid.

116.    The United States and the State of New York, unaware of the foregoing circumstances and conduct of Defendants, and unaware of the falsity of the records and or statements made, used, or caused to be made or used by Defendants, and in reliance on the accuracy thereof, paid the false or fraudulent claims submitted, which resulted in the United States and the State of New York being damaged in an amount to be established at trial or upon motion.

## COUNT THREE
### (All Defendants)

**(31 U.S.C. Section 3729(a) (3) (Federal False Claims Act);
New York False Claims Act - State Fin. Law, § 189(1)(c);
New Jersey False Claims Act – NJSA §2A:32C-3(c))
(Knowingly Engaging In a Conspiracy In Violation
of the False Claims Act)**

117.    Plaintiff-Relator incorporates the foregoing paragraphs as if fully set forth herein.

118.    As a result of their illegal business and financial arrangements, and illegal

conduct, Defendants conspired to obtain payments wrongfully from the United States in

violation of 31 U.S.C. Section 3729(a)(3), from the State of New York in violation of

New York State Finance Law § 189(1)(a), and from the State of New Jersey in violation

of NJSA §2A:32C-3(c). As a consequence of this illegal conspiracy, the United States,

the State of New York and the State of New Jersey have suffered substantial damages in

an amount to be determined at trial or upon motion.

## COUNT FOUR
**(Nephrology Associates of Manhattan; Lower Manhattan Dialysis Centers at 17th and 34th Streets; Chinatown Dialysis Center; River Renal Dialysis Center at Bellevue Hospital; Robert Matalon, M.D., Daniel Matalon, M.D., Albert Matalon, M.D., and all Dialysis Facilities Owned and/or Operated by Them.)**

### (42 U.S.C. § 1320a-7a(a)(7) and 1320a-7b(b)(1))
**(Violation of the Self-Referral and Anti-Kickback Laws)**

119.    Plaintiff-Relator incorporates the foregoing paragraphs as if fully set forth

herein.

120.    By virtue of the acts described herein, Defendant Matalon and his

associated facilities knowingly submitted, or caused to be submitted, false or fraudulent

claims for payment to officials of the United States Government in violation of the

Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, the State of New York in violation

of the State of New York's False Claims Act, N.Y. State Fin. § 187 *et seq.*, and in

violation of the State of New Jersey's False Claims Act, NJSA §§ 2A:32C-1 *et seq.* by

knowingly and willfully soliciting remuneration, directly and indirectly, overtly and

covertly, in cash and in kind, Defendant Matalon, in order to induce the Defendant

hospitals to refer hemodialysis patients to Matalon's hemodialysis facilities, for which

payments for such procedures and consults were made in whole and in part under state

and federal health care program, all in violation of 42 U.S.C. § 1320a-7a(a)(7) and 1320a-7b(b)(1).

121.    Plaintiff the United States, and the States of New York and New Jersey, unaware of the foregoing circumstances and conduct of Defendants, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendants, which resulted in the United States and the States being damaged in an amount to be established at trial or upon motion.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff-Relator, on behalf of himself, the United States of America, and the State of New York, and the State of New Jersey demands judgment against Defendants as follows:

A. All Counts:

    (a)    Treble the amount of damages sustained by the United States, in an amount to be established at trial equal to the amount of false claims submitted by Defendant;

    (b)    Assessment of a civil penalty of $10,000 for each false or fraudulent claim that Defendant made or caused to be made to the government;

    (c)    All other necessary and proper relief, including the costs of this action.

In addition, Plaintiff-Relator, on his behalf further demands:

    (a)    That, in the event that the United States of America, the State of New York or the State of New Jersey proceed with this action or

otherwise settle these claims, the Court award to Plaintiff-Relator an amount of the proceeds of this action or settlement of these claims of not less than 15% and as much as 25% pursuant together with an amount of reasonable expenses incurred by Plaintiff-Relator, plus reasonable attorneys' fees and all costs and expenses incurred by the Plaintiff-Relator in bringing this action.

(b)     That in the event that the United States of America does not proceed with this action, the Court award to Plaintiff-Relator an amount of the proceeds of this action or settlement of claims of not less than 25% and as much as 30% pursuant to 31 U.S.C. 3730 (together with an amount of reasonable expenses incurred by Plaintiff-Relator, plus reasonable attorneys' fees and all costs and expenses incurred by the Plaintiff-Relator in bringing this action.

(c)     Such other and further relief that this Court deems just and proper.

### Jury Demand

Pursuant to Fed. R. Civ. P. 38, Plaintiff-Relator demands trial by jury.

Dated: June 28, 2012.

J. Stephen Simms (*Pro Hac Vice* pending)
Simms Showers LLP
20 S. Charles Street
Suite 702
Baltimore, Maryland 21201
Phone:  410-783-5795
jssimms@simmsshowers.com

Counsel to Plaintiff-Relator