UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
UNITED STATES OF AMERICA, *ex rel*.                          :
MICHAEL I. LEVINE, M.D.,                                     :          12 Civ. 5103 (LGS)
                                         Plaintiffs,         :
                                                             :       **OPINION AND ORDER**
                    -against-                                :
                                                             :
VASCULAR ACCESS CENTERS L.P., *et al.*,                      :
                                                             :
                                         Defendants.         :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

Plaintiff Michael I. Levine, M.D. ("Relator") brings this action under the *qui tam*

provisions of the False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA"), on behalf of the United

States of America (the "Government") against Defendant Joseph Shams, M.D. ("Defendant

Shams") and Defendants Robert Matalon, M.D., Daniel Matalon, M.D. and Albert Matalon,

M.D. (collectively, the "Matalon Defendants").  Defendants move to dismiss the Amended

Complaint (the "Complaint") for failure to state a claim under Rule 12(b)(6) and for failure to

plead fraud with particularity under Rule 9(b).  Defendant Shams also moves to dismiss for lack

of subject matter jurisdiction under Rule 12(b)(1).  For the reasons below, the motions to dismiss

are granted.

## I.      BACKGROUND

The following facts are taken from the Complaint and are accepted as true only for the

purposes of this motion.[1]  *See Yamashita v. Scholastic Inc.*, 936 F.3d 98, 103-04 (2d Cir. 2019).

---

[1] Defendant Shams submitted a declaration in support of his motion to dismiss, which attaches
the Wall Street Journal's publications of Centers for Medicaid & Medicare Services ("CMS")
data.  Relator argues that these exhibits are matters outside the pleadings, which if considered,
should convert the motion into one for summary judgment per Rule 12(d).  Although these

Defendants are nephrologists who treat patients with end stage renal disease ("ESRD"), many of whom are covered by or qualify for the Government's Medicare and Medicaid programs.  Dr. Shams performs vascular and diagnostic radiology and works for the Beth Israel Medical Center's vascular access center, among other facilities.  Defendant Robert Matalon owns and operates several dialysis centers.  Defendants Albert Matalon and Daniel Matalon work at Robert Matalon's centers.  Relator is also a physician, trained as an interventional nephrologist, who worked at the Vascular Access Centers and Philadelphia Access Centers, facilities owned by Dr. James McGuckin, Jr., and at dialysis centers managed or operated by the Matalon Defendants.

### A.   "Self-Referral" Scheme

When Relator practiced at Dr. McGuckin's vascular access center, he witnessed a so-called "self-referral" practice.  Primary or treating nephrologists typically refer ESRD patients to specialists at vascular access centers for surgical implementation of long-term vascular access, meaning access to a patient's arteries and veins through grafts and fistulas.  According to the Complaint, the Government's reimbursement rules require that primary or treating nephrologists at dialysis centers -- and not interventionists at vascular access centers -- maintain responsibility for monitoring an ESRD patient's vascular access and determining whether follow-on visits or procedures are themselves necessary.  Still, interventionists -- seeking financial gain -- may "capture" patients through "self-referred" appointments and procedures at their facilities and bill the Government regardless of whether they are medically necessary, in violation of CMS rules.

---

materials likely are appropriate to consider on a motion to dismiss as the Complaint relies heavily on CMS data, s*ee Palin v. New York Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019) (material is not considered outside of the pleadings where the complaint "relies heavily upon its terms and effect"), this decision does not consider or rely on these publications.

Relator was later employed at a dialysis center owned by Robert Matalon, where he observed that many patients had follow-up appointments at vascular access centers, even though neither he nor the other healthcare professionals referred these patients for such appointments. Robert Matalon once remarked to Relator that decisions to refer patients to such centers must meet a "[w]hat's in it for me?" test, and at another time, acknowledged that a number of the facilities were "shady." Relator also noticed that Robert Matalon -- in cases where he learned patients were to receive access procedures by doctors other than Dr. Shams -- would instruct support staff at the Chinatown Dialysis Unit to redirect patient transport to Dr. Shams and the Beth Israel Union Square Center. Daniel and Albert Matalon had "full knowledge" of these arrangements and their patients' unnecessary procedures, because among other reasons, they would have looked at their patients' charts, which include information on procedures performed at the access centers.

Relator treated RG and JO while they were patients of the "Drs. Matalon or of the Matalon-owned and controlled dialysis facilities." The Complaint alleges that in 2009 patient RG was referred to Beth Israel for a vascular access procedure. The procedure was successful, yet the patient was scheduled for a follow-up visit at the Beth Israel Union Square Radiology Center. Relator called Dr. Shams at Beth Israel to find out why patient RG was scheduled for the appointment despite the successful procedure. Dr. Shams explained that it was routine practice at Beth Israel to schedule such follow-ups, stating "everyone does it," including American Access Care. Relator was aware of "self-referral" practices at American Access Care facilities, the subject of a *qui tam* suit against American Access Care Miami LLC that settled in June 2015. Relator's experience at Dr. McGuckin's vascular access centers also "informed [Relator's] understanding of what Dr. Shams meant when he stated . . . that 'everyone [did] it.'" Dr. Shams

3

explained that the follow-up was justified based on a "high incidence" of narrowing of vascular access after such procedures.  Relator suggested Dr. Shams publish such information as it contradicted current medical literature.  Relator advised the patient RG not to return unless any complications occurred.  In 2011, JO underwent a successful access procedure and was scheduled for a two-week follow-up appointment at Beth Israel's vascular access clinic.  Relator advised JO not to attend the appointment unless complications occurred.

The Complaint identifies two other patients who were subject to "self-referral" practices. "[T]he Matalons' Patient CB" had regular repeat procedures at unspecified times and presumed they were a result of "New York hustle."  Relator also treated patient "MH," who is not alleged to have been a patient at a dialysis center related to the Matalon Defendants.  After MH's access procedure in 2011, MH had multiple repeat procedures at Beth Israel Union Square Center despite a lack of clinical indications of access issues.  Relator did not refer MH for these appointments and was not aware of any other medical professional who initiated the referrals.

### B.  Dr. Shams' Alleged Fraudulent Scheme

Based on the above facts, the Complaint alleges that Dr. Shams submitted claims for Medicare and Medicaid reimbursement, and received payments for "self-referred" procedures and appointments in violation of the Government's reimbursement rules.  The Complaint also provides data concerning the number of venous angioplasties Dr. Shams performed from 2012 to 2017, which reflected an average per patient frequency between 3.5 and 4 per year, placing him each year between 7th and 17th out of over 3,000 physicians performing this procedure, supporting the inference that Dr. Shams billed the Government for at least some unnecessary procedures.  In addition, Dr. Shams charged the Government for routine office visits, which were either duplicative charges in conjunction with procedures for which he separately billed or were

charges for examinations and evaluations that already would have been performed by the patient's primary or treating nephrologist.  The Complaint also contains Dr. Shams' Medicare billing data for the period 2012 to 2017, and shows an increase from approximately $300,000 in 2012 to nearly $3.2 million in 2017, when the number of Medicare beneficiaries he treated showed a much smaller increase from 371 in 2012 to 427 in 2017.  Based on this circumstantial evidence of fraud, the Complaint estimates damages of approximately $425,000, trebled to about $1,275,000, assuming that 27% of Dr. Shams's angioplasties were medically unnecessary.  This percentage is based on an estimate by a medical expert in another matter involving similar fraud allegations.

### C.  Matalon Defendants' Alleged Fraudulent Scheme

The Complaint alleges that, in addition to causing Dr. Shams' and his vascular access center's submission of false claims, the Matalon Defendants themselves submitted fraudulent Medicare and Medicaid claims.  The Matalon Defendants receive "monthly capitated fees," intended to reimburse nephrologists for ongoing assessment of health issues associated with ESRD, including "access surveillance."  The Complaint alleges that if the Matalon Defendants had been monitoring their patients' vascular access, as required by CMS regulations, they would have prevented their patients from being seen by fraudulent access centers.  Instead, they "fed" their patients to them and "farmed out" their monitoring responsibilities, "vitiat[ing] the medical necessity of their own claims for capitated payments, and therefore render[ing] those claims false within the meaning of the FCA."

## II.   PROCEDURAL HISTORY

The original complaint was filed under seal on June 29, 2012, and alleged claims against the Vascular Access Centers, L.P. and its subsidiaries and related corporations (the "VAC

Defendants"), Dr. James McGuckin, Jr., Dr. Shams and the Matalon Defendants, among others. The case remained sealed pending the United States' determination whether to intervene.  *See* 31 U.S.C. §§ 3730(b)(2)-(4).  The United States elected to intervene against the VAC Defendants in July 2018 and settled its claims against them in October 2018.  Relator provided notice that he intended to pursue claims against the remaining defendants, but subsequently dismissed all defendants except Dr. Shams and the Matalon Defendants.  In response to Defendants' assertion that the original complaint was deficient under Rule 9(b), Relator filed the Amended Complaint (previously defined as the "Complaint") in August 2019 and filed a corrected version in October 2019, removing claims under the New York False Claims Act.[2]  The remaining two claims arise under the FCA:  (1) that Defendants knowingly presented, or caused to be presented, false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1) and (2) that Defendants knowingly made, used, or caused to be made or used, false statements or records in violation of 31 U.S.C. § 3729(a)(2).[3]

## III.   STANDARDS

### A.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Daly v. Citigroup Inc.*, 939 F.3d 415, 425 (2d Cir. 2019), *cert. denied*, 140 S. Ct. 1117 (2020) (quotation

---

[2] The parties agreed -- and the Court so-ordered -- that although the Complaint includes as defendants Dr. McGuckin, the VAC Defendants and the Philadelphia Vascular Institute, Relator does not seek to litigate the claims as to those defendants.  Rather, they are identified because settlement payments are still owed.

[3] These are the current liability provisions of the FCA.  The Complaint references 31 U.S.C. § 3729(a)(1) and (a)(2), which were the designations prior to 2009.  *See* 31 U.S.C. §§ 3729(a)(1)-(2) (2008).

marks omitted).  "[T]he question of whether a federal statute supplies a basis for subject matter

jurisdiction is separate from, and should be answered prior to, the question of whether the

plaintiff can state a claim for relief under that statute."  *Carlson v. Principal Fin. Grp.*, 320 F.3d

301, 306 (2d Cir. 2003).

### B.  Rule 9(b)

Rule 9(b) applies because the FCA is an anti-fraud statute.  *See United States ex rel.*

*Chorches for Bankr. Estate of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir.

2017).  Pursuant to Rule 9(b), claims alleging fraud "must state with particularity the

circumstances constituting fraud."  FED. R. CIV. P. 9(b).  This Rule "ordinarily requires a

complaint alleging fraud to '(1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent.'"  *Chorches*, 865 F.3d at 81 (quoting *United States ex rel. Ladas*

*v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016)).

Rule 9(b) is "designed to provide a defendant with fair notice of a plaintiff's claim, to

safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a

defendant against the institution of a strike suit."  *Id.* at 86.  Since fair notice is essential, under

Rule 9(b), a plaintiff alleging a claim sounding in fraud against multiple defendants must inform

each defendant of the nature of his participation in the fraud.  *See Loreley Fin. (Jersey) No. 3*

*Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 172 (2d Cir. 2015).

### IV.  DISCUSSION

#### A.  Dr. Shams

Dr. Shams moves to dismiss the Complaint for lack of subject matter jurisdiction under

Rule 12(b)(1), contending that the FCA's pre-2010 version of the public disclosure bar applies to

the claims.  Dr. Shams also moves to dismiss for failure to state a claim and for failure to plead

fraud with particularity.  The motion to dismiss based on Rule 12(b)(1) is denied.  Counts One

and Two are dismissed as to Dr. Shams because the claims lack the particularity required by

Rule 9(b).

### i.   Public Disclosure Bar

The public disclosure bar does not bar Relator's claims against Dr. Shams.  Before 2010,

the FCA's public disclosure bar was jurisdictional, *see Chorches*, 865 F.3d at 80, and provided

that "[n]o court shall have jurisdiction over an action under [Section 3730(e)(4)] based upon the

public disclosure of allegations or transactions . . . unless the action is brought by the Attorney

General or the person bringing the action is an original source of the information." 31 U.S.C. §

3730(e)(4) (2006).  In 2010, the Patient Protection and Affordable Care Act amended Section

3730(e)(4) to its current form, removing the jurisdictional bar.  *See* Pub. L. 111-148, §

10104(j)(2), 124 Stat. 119 (Mar. 23, 2010).  Since the pre-2010 public disclosure bar limits a

court's jurisdiction, it must be addressed as to any FCA claims accruing before March 23, 2010.

*See Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280,

283 n.1 (2010) (interpreting 2010 amendments as not having retroactive effect); *United States ex

rel. Daugherty v. Tiversa Holding Corp.*, 342 F. Supp. 3d 418, 427 (S.D.N.Y. 2018) (applying

the pre-amendment version of the public disclosure bar to claims based on fraudulent conduct

occurring prior to March 23, 2010).  The parties dispute whether the pre-2010 public disclosure

bar applies, but these arguments need not be addressed since the bar does not foreclose the

claims even if they accrued prior to March 23, 2010.

For the pre-amendment public disclosure bar to apply, the action must be "based upon the

public disclosure of allegations or transactions in a criminal, civil, or administrative hearing . . .

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." § 3730(e)(4); *accord U.S. ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993). "[T]here must be 'public disclosure' of the information on which the allegation of fraud rests, and this 'public disclosure' must occur through one of the sources enumerated in the statute." *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 103 (2d Cir. 2010), *rev'd on other grounds*, 563 U.S. 401 (2011). The meaning of the "public disclosure of allegations or transactions" has been explained as follows: "[I]f X + Y = Z, Z represents the allegation of fraud and X and Y represent its essential elements . . . to disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed." *Daugherty*, 342 F. Supp. 3d at 426 (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 653-54 (D.C. Cir. 1994)). Dr. Shams argues that the action relies on public information from a *qui tam* action involving American Access Care Miami LLC and other related third-party information. However, this information is not disclosure "from which readers or listeners may infer" that Dr. Shams allegedly submitted false claims. *See id.* at 426 (quoting *Springfield Terminal Ry. Co.*, 14 F.3d at 653-54). Since Dr. Shams is not the subject of -- or related to the subject of -- this public information, the public disclosure bar does not apply. *See id.* (concluding there is no public disclosure of fraud by the defendant on a government agency, where the agency is not mentioned in the at-issue public disclosures); *U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 347 (S.D.N.Y. 2014) ("In order to bar claims against a particular defendant, the public disclosures relating to the fraud must either explicitly identify that defendant as a participant in the alleged scheme, or

provide enough information about the participants in the scheme such that the defendant is identifiable.").[4]

Therefore, the Court has subject matter jurisdiction even as to any claims against Dr. Shams that accrued prior to March 23, 2010.

### ii.  Failure to Plead Fraud with Particularity

The Complaint fails to allege with particularity the circumstances of Dr. Shams' allegedly fraudulent scheme of self-referrals.  "[F]raud under the FCA has two components:  the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent." *Chorches*, 865 F.3d. at 83.  To plead submission of a false claim with particularity, "[i]n cases with extensive schemes, plaintiffs can satisfy this requirement in two ways: (1) providing sufficient identifying information about all the false claims, or (2) providing example false claims." *United States v. Visiting Nurse Serv. of New York*, 14 Civ. 5739, 2017 WL 5515860, at *14 (S.D.N.Y. Sept. 26, 2017).  "[T]he adequacy of particularized allegations under Rule 9(b) is . . .  case- and context-specific." *Chorches*, 865 F.3d. at 81.

Here, the Complaint alleges that Dr. Shams submitted claims for medically unnecessary procedures and appointments for Medicare and Medicaid reimbursement based on few allegations specific to Dr. Shams: a 2009 phone call and annualized Medicare and Medicaid billing information between 2012 and 2017.  The Complaint fails to provide representative

---

[4] Dr. Shams argues that the public disclosure bar applies in part because Relator does not qualify as an "original source," an exception to the public disclosure bar.  *See* 31 U.S.C. § 3730(e)(4) (stating that the public disclosure bar applies "unless the person bringing the action is an original source of the information).  However, as discussed above, the public disclosure bar does not apply because the Complaint is not based on the same "allegations or transactions" as the prior proceeding, and therefore the "original source" exception to the bar does not need to be reached.

examples of Dr. Shams' false claims or cases where he allegedly carried out his self-referral scheme sufficient to satisfy the Rule 9(b) particularity requirement.

One set of allegations specific to Dr. Shams relates to his CMS billing data between 2012 and 2017.  The Complaint alleges that the data give rise to an inference of fraud because of the quantity and types of claims and the amount reimbursed.  Specifically, the Complaint alleges that "the quantity [and frequency] of certain procedures" is "indicative of the lack of medical necessity of the procedures . . . and [Dr. Shams'] practice of self-referral" and concludes that at least some of the resulting billings -- without further identification -- must have been fraudulent. The Complaint also alleges that Dr. Shams charged the Government using two particular billing codes -- one for established patient visits and one for new patient visits -- as well as "other [unidentified] Codes reflecting routine office visits" between 2012 and 2017.  Relator surmises that billing for these visits -- without alleging any other details about them -- must have been fraudulent because, based on the Relator's personal experience, an interventionist would have no medical reason to schedule these visits.  This information is insufficiently particularized to identify the false claims at issue, since the data is generalized and does not provide adequate identifying information like a "a single patient's identification information" or "dates of service." *See Visiting Nurse Serv. of New York*, 2017 WL 5515860, at *17 (holding particularized circumstances of fraud lacking where allegation was solely based on "six years of aggregate data, which reflect that a higher portion of home health aide hours were billed to Medicaid than to Medicare").  A range of years and aggregate billings untethered to allegations of particularized conduct by Dr. Shams is insufficient.

The second set of allegations specific to Dr. Shams relates to a 2009 telephone call. Relator called Dr. Shams about patient RG, who underwent a successful vascular access

procedure at Beth Israel.  RG was scheduled for a follow-up appointment, which Relator

believed to be medically unnecessary but which Dr. Shams, during the call, described as their

routine practice, stating that "everyone did it."  On Relator's advice, patient RG did not attend

the follow-up appointment, and consequently, no resulting fraudulent billing occurred.  This

example is pleaded as evidence that Dr. Shams "engaged in a practice of self referral" and does

not purport to provide a particularized example that resulted in fraudulent billing.  Moreover, the

conversation occurred three years before the beginning of the alleged period in question.[5]  *See*

*United States ex rel. Aryai v. Skanska*, No. 09 Civ. 5456, 2019 WL 1258938, at *9 (S.D.N.Y.

Mar. 19, 2019) (finding verbal confirmation of "past, current, and future involvement and

participation in the gratis pay scheme," insufficient to allege "where and when" the fraudulent

conduct occurred).  Accordingly, the allegations about RG do not provide a relevant example of

a false claim.

Relator cannot rely on the Second Circuit's holding in *Chorches* as an end-run around the

requirements of Rule 9(b).  In *Chorches*, a relator alleged that the defendant ambulance company

submitted false claims for ambulance transport.  *Chorches*, 865 F.3d. at 76.  The Second Circuit

held that "a complaint can satisfy Rule 9(b)'s particularity requirement by making plausible

allegations creating a strong inference that *specific false claims* were submitted to the

government and that the information that would permit further identification of those claims is

peculiarly within the opposing party's knowledge."  *Id.* at 86 (emphasis added).  The Second

Circuit declined to apply Rule 9(b) to require that "every *qui tam* complaint allege on personal

---

[5] Other than patient RG -- who did not attend the follow-up appointment -- the Complaint
describes two other patients -- JO and MH -- who underwent "self-referred" appointments and
procedures at Beth Israel's access clinic, the Beth Israel Dialysis Unit at Irving Place or at Beth
Israel Union Square Center.  Neither of these patients was allegedly treated by Dr. Shams.

knowledge specific identified false invoices submitted to the government." *Id.* Where the complaint described a scheme to falsify records "and describe[d] specific instances of the implementation of that scheme," the court found sufficient additional allegations creating a strong inference that those records and instances resulted in the submission of false claims to the government and did not require particularized allegations about the false bills themselves. *Id*. at 84-85. The defendant was "on notice of specific claims allegedly submitted to the government" because of the complaint's details including "dates of runs, patient names, actual reasons for the transport, and the information entered into [falsified reports] *with respect to specific runs for which false claims were allegedly submitted*." *Id.* at 87 (emphasis added). Here, in contrast, there are no allegations particular to Dr. Shams that provide notice as to any specific false claims allegedly submitted to the government.

Accordingly, Dr. Shams' motion to dismiss Counts One and Two is granted for failure to plead with particularity under Rule 9(b).

### B.  The Matalon Defendants

The Matalon Defendants move to dismiss for failure to state a claim and failure to plead fraud with particularity. The Complaint alleges two theories by which the Matalon Defendants violated the FCA: they caused the false claims submitted by Dr. Shams and they submitted their own false claims for capitation payments. These theories are based on the same alleged fraudulent scheme -- they referred their patients to vascular access centers with "self-referral" practices and allowed them to attend these medically unnecessary appointments and procedures, failing to monitor appropriately their patients' vascular access. For the reasons that follow, Counts One and Two as to the Matalon Defendants are also dismissed for failure to plead fraud with particularity.

13

i.     **Defendants Albert and Daniel Matalon**

The Complaint does not plead with particularity Defendants Albert and Daniel Matalon's alleged fraudulent scheme.  Rule 9(b) requires that a complaint's allegations "inform each defendant of the nature of [its] alleged participation in the fraud." *Loreley Financing (Jersey) No. 3 Ltd.*, 797 F.3d at 172 (quotation marks omitted); *accord In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 213 (S.D.N.Y. 2019).  Generally, "[s]weeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 579-80 (2d Cir. 2005) (quotations omitted); *accord Trahan v. Lazar*, No. 19 Civ. 01131, 2020 WL 2086610, at *7 (S.D.N.Y. Apr. 30, 2020) ("[A] complaint may not rely upon blanket references to the acts of all of the defendants without identifying the nature of each defendant's participation in the fraud." (quotation marks omitted)).

The Complaint does not contain sufficient allegations of fraudulent conduct specific to Defendant Albert Matalon or Defendant Daniel Matalon.  Instead, the Complaint broadly alleges that, among other reasons, patient feedback made it "virtually inevitable" that all of the Matalon Defendants would be aware of the unnecessary procedures occurring at these centers.  Despite this knowledge, the Matalon Defendants "continued to feed a steady stream of patients to these fraudulent vascular access centers performing unnecessary procedures and non-covered vascular access monitoring and surveillance . . . thereby knowingly causing the false and fraudulent claims submitted to the Government."

Regarding the theory that the Matalon Defendants submitted their own false claims for capitation payments, the Complaint alleges that "the Matalons 'farmed out' the management and observation of patients' access to the access clinics by Dr. Shams and Beth Israel."  The few

14

statements that refer individually to one of the Matalon Defendants are conclusory.  The Complaint alleges that Defendants Albert and Daniel Matalon "would have routinely and regularly" reviewed patient charts and would be on notice of the medically unnecessary procedures at the access centers.  Allegations on what individuals "would have" done are allegations of "custom and practice" that are insufficiently specific.  *See United States ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29 (2d Cir. 2017) (summary order).  A second statement alleges conduct by "merely tack[ing] on conclusory assertions" that acts were done with Defendants Albert and Daniel Matalon's "knowledge."  *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017).  Without any specific factual allegations as to the alleged fraudulent conduct by the Matalon Defendants, the claims are legally insufficient.

### ii.   Defendant Robert Matalon

The allegations with respect to Defendant Robert Matalon do not satisfy Rule 9(b) for failure to provide notice as to "where and when" he allegedly committed the alleged fraud.  *Chorches*, 865 F.3d at 81.  The Complaint alleges that Robert Matalon "went along and collaborated with the vascular access centers" by "allowing, or at least not stopping" patients from undergoing medically unnecessary appointments or procedures at access centers; that he instructed support staff to redirect van transportation, arranged for ill and low-income patients, so that patients would be seen by Dr. Shams and the Beth Israel Union Square Center; that he once stated that making initial referral decisions to these centers were based on a "what's in it for me" test; and that in another conversation, he acknowledged that "a number" of the centers "are shady."  These allegations insufficiently allege any particular instances when he allegedly "collaborated with the vascular access centers . . . by allowing, or at least not stopping, the patients" from attending medically unnecessary procedures.  *Cf. id.* at 77, 83-84, 87 (finding

complaint sufficiently detailed where, "with respect to specific runs for which false claims were allegedly submitted," it provided "dates of runs, patient names, actual reasons for the transport, and the information entered into [reports]," among other facts); *Visiting Nurse Serv. of New York*, 2017 WL 5515860, at *15 (finding identification of ten different patients who did not receive required services and whose claims were submitted to CMS sufficient to "put defendant on notice about what claims are alleged to be fraudulent").

The Complaint does not "describe[] specific instances of the implementation of [the] scheme" by Defendant Robert Matalon that would rectify this insufficiency. *Chorches*, 865 F.3d at 84. It identifies a few patients and the month and year of their access procedures at various Beth Israel facilities, but it does not specify who of the Matalon Defendants, if any, were actually involved in treating or referring the named patients. Patients RG and JO were either "patients of the Drs. Matalon or of the Matalon-owned and controlled dialysis facilities," while CB was a patient of the "Drs. Matalon." Further, none of these patients are described as those whom Defendant Robert Matalon allegedly steered through transportation arrangements. These allegations are equivalent to group-pleaded allegations and are insufficiently particular as to Dr. Robert Matalon. *See United States v. Strock*, No. 15 Civ. 0887, 2019 WL 4640687, at *6 (W.D.N.Y. Sept. 24, 2019) (explaining that FCA allegations involving "[defendant] *or other employees*" are insufficient to satisfy Rule 9(b)).

As with the allegations with respect to Dr. Shams, the Complaint fails to plead the Matalon Defendants' fraudulent conduct with particularity. Accordingly, the Matalon Defendants' motion to dismiss is granted.

## V.        LEAVE TO AMEND

Generally, leave to amend is freely granted where dismissal of the complaint is based on

Rule 9(b).  *See Aetna Cas. & Sur. Co.*, 404 F.3d at 581; *accord In re AXA Equitable Life Ins. Co.*

*COI Litig.*, No. 16 Civ. 740, 2019 WL 1382437, at *2 (S.D.N.Y. Mar. 27, 2019).  Leave to amend

may be denied where a party was provided an opportunity to amend the complaint but declined

to do so.  *See United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.*, 319 F. Supp. 3d

747, 751 (S.D.N.Y. 2018) ("Courts have regularly found amendment futile and dismissal with

prejudice appropriate where a relator has failed to meet Rule 9(b)'s requirements despite

previous opportunities for amendment.").  Here, as recognized in his opposition, Relator was

"allow[ed] . . . to amend his complaint to cure . . . alleged defects" related to Rule 9(b)," and

filed the Amended Complaint following the United States' complaint-in-intervention.  At the pre-

motion conference on September 10, 2019, Relator was offered another opportunity to file a

second amended complaint to address the remaining deficiencies and declined to do so.

Presumably, if Relator had the ability to identify particular instances of fraudulent activity

specific to any individual defendant, he would have done so, instead of referencing patients who,

as discussed above, were treated by unidentified individuals at a facility where defendants

worked, or who declined a visit that could have resulted in a false claim.  Leave to replead is

denied.

## VI.       CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint are

GRANTED.  The Complaint is dismissed with prejudice.

The Clerk of Court is respectfully directed to close Docket Nos. 176 and 180, and close

the case.

Dated: September 15, 2020
      New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

18